IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

ACUMED LLC,

           Plaintiff,

    v.

SKELETAL DYNAMICS, LLC,

           Defendant.

Civ. No. 3:15-cv-01581-PA

**OPINION & ORDER**

PANNER, Senior District Judge.

This matter comes before the Court on Defendant's Motion to Dismiss. ECF No. 10. In the alternative, Defendant moves to transfer this case to the United States District Court for the Southern District of Florida. For the reasons set forth below, Defendant's motion is GRANTED.

**Background**

Plaintiff in this case is Acumed LLC ("Acumed"), a Delaware limited liability company with its principal place of business in Hillsboro, Oregon. Acumed holds a number of patents, including U.S. Patent No. 6,030,162 ("the '162 patent"), which was issued on February 29, 2000, and is titled as "Axial Tension Screw."

Page 1 – ORDER

Defendant Skeletal Dynamics LLC ("Skeletal") is a privately held Florida limited liability company with its principal place of business in Miami, Florida. Skeletal produces a number of medical devices for use in upper extremity orthopedic surgery. In March 2015 Skeletal began selling a product called the Reduct Headless Compression Screw ("the Reduct screw").

On August 20, 2015, Acumed brought this action, alleging that Skeletal's Reduct screw infringed on the '162 patent.

## Legal Standards

Federal Circuit law, rather than regional circuit law, determines whether a district court has personal jurisdiction over the defendant in a patent infringement case. *Avocent Huntsville Corp. v. Aten Intern. Co. Ltd.*, 552 F.3d 1324, 1328 (Fed. Cir. 2008). If the parties have not conducted discovery, the plaintiff need only make a prima facie showing that the defendant is subject to personal jurisdiction. *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003). In evaluating a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the court construes the pleadings and affidavits in the light most favorable to the non-moving party. *Graphics Controls Corp. v. Utah Med. Prods., Inc.* 149 F.3d 1382, 1383 n.1 (Fed. Cir. 1998).

Personal jurisdiction over an out-of-state defendant in a patent-related dispute involves two questions: whether jurisdiction exists under the forum state's long-arm statute and, if so, whether asserting personal jurisdiction is consistent with the limitations of the Due Process Clause of the Constitution. *Trintec Indus. Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1279 (Fed. Cir. 2005). These inquiries essentially merge because Oregon's long-arm statute extends jurisdiction to the outer limits of due process. *Columbia Sportswear North America, Inc.*

*v. Seirus Innovative Accessories*, No. 3:15-cv-00064-HZ, 2015 WL 3986148, at *2 (D. Or. June 29, 2015); *see also Trintec*, 395 F.3d at 1279 ("collaps[ing]" the two-part inquiry where a state's long-arm statute is coextensive with the limits of due process).

The Due Process Clause "protects an individual's liberty interest in not being subject to the binding judgment of a forum with which he has established no meaningful contacts, ties, or relationships." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (internal quotation marks and citations omitted). To satisfy this due process protection, the plaintiff must show that the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "The requirement for purposeful minimum contacts helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum." *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1565 (Fed. Cir. 1994).

"Under the 'minimum contacts' test, a defendant may be subject to either specific jurisdiction or general jurisdiction." *LSI Indus., Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir. 2000). A court has general jurisdiction over a nonresident defendant when that defendant has "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). A court has specific jurisdiction where "the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King*, 471 U.S. at 472 (internal quotation marks and citations omitted); *see also Beverly Hills Fan Co.*, 21 F.3d at 1562 n. 10 (citation omitted). In contrast to general jurisdiction, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the

Page 3 – ORDER

very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks and citation omitted).

A district court may exercise specific personal jurisdiction over a defendant subject to a three part test: (1) the defendant must have purposefully directed its activities at residents of the forum; (2) the plaintiff's claim must arise out of or relate to those activities; and (3) the exercise of personal jurisdiction must be reasonable and fair. *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1018 (Fed. Cir. 2009) (citing *Breckenridge Pharm. Inc. v. Metabolite Labs, Inc.*, 444 F.3d 1356, 1363 (Fed. Cir. 2006)). Under this test, a court may properly assert specific jurisdiction "even if the contacts are isolated and sporadic," as long as the cause of action arises out of or relates to those contacts. *Silent Drive, Inc.*, 326 F.3d at 1200 (citing *Burger King*, 471 U.S. at 472-73). The plaintiff bears the burden at steps one and two, but the burden shifts to the defendant at step three to prove that personal jurisdiction is unreasonable. *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1346 (Fed. Cir. 2012).

## Discussion

Skeletal moves to dismiss this action, alleging a lack of personal jurisdiction.[1] In the alternative, Skeletal moves to transfer this action to the Southern District of Florida.

### I.  Skeletal's Activities in Oregon

Before proceeding to the jurisdictional analysis, it is necessary to describe Skeletal's activities as they relate to Oregon and the Reduct screw. As previously noted, Skeletal is a Florida limited liability company that has never registered to do business in Oregon. Escagedo Decl. at 2. Skeletal has no offices or property in Oregon, nor does it have an Oregon mailing

---

[1] Skeletal also initially moved to dismiss on the basis of improper venue, but concedes that the Federal Circuit's recent decision in *In Re: TC Heartland LLC*, 821 F.3d 1338 (Fed. Cir. 2016), is contrary to that argument. ECF Dkt. # 36. I accept Skeletal's concession and commend counsel for their prompt notice to the Court regarding the Federal Circuit's decision.

Page 4 – ORDER

address or telephone number, and none of its manufacturing is done in Oregon. Escagedo Decl. at 2. Skeletal does have a website that describes its products, but which does not offer the products for sale, consistent with industry regulations. Escagedo Decl. at 3.

The sale and marketing of Skeletal's products in Oregon is overseen by Trey Campbell ("Campbell"), Skeletal's Director of Sales and Marketing for the Western United States. Escagedo Decl. at 2; Campbell Decl. at 2. Campbell lives in Texas, but periodically travels to Oregon on behalf of Skeletal. Escagedo Decl. at 2; Campbell Decl. at 2. Campbell is also responsible for directing the independent distributors who promote the sale of Skeletal products. Escagedo Decl. at 2-3; Campbell Decl. at 2-3. Oregon sales account for 1 percent of Skeletal's total sales. Escagedo Decl. at 3.

Skeletal works with one independent distributor in Oregon, Rocky Mountain Medical ("Rocky Mountain"). Escagedo Decl. at 3. Rocky Mountain is based in Spokane, Washington, and is responsible for distribution in Oregon, Idaho, and Washington. Escagedo Decl. at 3. Skeletal's Sales Representation Agreement with Rocky Mountain includes the Reduct screw. Kolitch Decl. Ex. D, at 15. Skeletal also provided Rocky Mountain with price sheets for its products, including the Reduct screw. Kolitch Decl. Ex. B. One of Rocky Mountain's employees, Michael MacDonald ("MacDonald") is authorized to sell certain Skeletal products in Oregon. Campbell Decl. at 3. After the commencement of this lawsuit, Skeletal amended its Sales Representation Agreement with Rocky Mountain to prevent the sale of Reduct screws in Oregon. Kolitch Decl. Ex. F at 41.

Skeletal first sold the Reduct screw in March 2015. Escagedo Decl. at 2. Skeletal sells the Reduct screw as part of the Reduct Headless Compression Screw System ("Reduct System"), which includes a sterilization tray, specially designed instruments, and implants required for use

Page 5 – ORDER

of the Reduct screw. Escagedo Decl. at 3. When Skeletal first began to sell the Reduct screws it had only a limited number of Reduct Systems available, none of which were designated for sale in Oregon. Kolitch Decl. Ex. F, at 46. Regulations require that Skeletal keep track of the names and addresses of any facility to which Skeletal ships its products. Second Escagedo Decl. at 4. After Skeletal was served with the Complaint in this case, it took steps to ensure that no Reduct screws were shipped to Oregon. Kolitch Decl. Ex. F, at 46. Neither Skeletal or Rocky Mountain have sold any Reduct screws in Oregon, nor has Skeletal shipped any Reduct Systems to Oregon. Escagedo Decl. at 3; Campbell Decl. at 3. Rocky Mountain cannot access either the Reduct System or the Reduct screw without authorization from Campbell and Campbell has not given that authorization. Campbell Decl. at 3. Rocky Mountain denies that it has marketed or sold the Reduct product in Oregon without Skeletal's knowledge. Campbell Decl. at 3.

Skeletal's target demographic is orthopedic surgeons. Second Escagedo Decl. at 2. Before selling its products, either Skeletal or its independent sales representatives will approach surgeons directly to gauge their interest in Skeletal's products. Second Escagedo Decl. at 2-3. Product pricing is not generally discussed in Skeletal's meetings with surgeons. Second Escagedo Decl. at 3; Price Decl. Ex. 4, at 35-36. Rather, if the surgeon expresses interest in using a particular product, Skeletal will approach the hospital or surgery center where the physician works or where a particular procedure will be performed. Second Escagedo Decl. at 3. Generally, the facility refers the matter to a "Value Analysis" program ("VA") and Skeletal will negotiate with the VA on issues of pricing and product availability. Second Escagedo Decl. at 3. If Skeletal reaches an agreement with a facility's VA on the use of Reduct products, it will send the facility a "tray" containing the Reduct System. Second Escagedo Decl. at 3-4. If the facility

uses a part from the Reduct system, it will inform Skeletal and only then will Skeletal bill the facility. Second Escagedo Decl. at 4.

In April 2015, Campbell met with an Oregon physician to show him the Reduct screw. Kolitch Decl. Ex. E, at 31. For the purposes of the meeting, Campbell brought a single Reduct screw with him. Kolitch Decl. Ex. E, at 31. Campbell was not authorized to discuss price, quantity, delivery, or any other terms for the sale of the Reduct screw. Second Escagedo Decl. at 5. Campbell informed the physician that the screw would be available at some point in the future, but Campbell did not provide the physician with any literature about the Reduct screws, nor did they discuss pricing. Kolitch Decl. Ex. E at 35. Skeletal never approached the facility where the Oregon surgeon worked about purchasing the Reduct screw and never initiated the VA process. Second Escagedo Decl. at 5. Campbell described this meeting as "preselling." Kolitch Decl. Ex. E at 35.

On October 1, 2015, Skeletal was awarded a three-year non-exclusive contract with Trinity Health, a healthcare provider that covers 78 hospitals, including three in Oregon, which would permit Skeletal to sell its products, including the Reduct screw, to Trinity Health hospitals. Kolitch Decl. Ex. C; Ex. E at 26. Actual sale of Skeletal products would still require approval by the individual hospitals through the VA process, and none of Trinity Health's Oregon hospitals have entered into agreements to purchase the Reduct screws. Kolitch Decl. Ex. E at 26-28; Second Escagedo Decl. at 3; Price Decl. Ex. 4, at 27. Skeletal has not gone through the VA process with any of Trinity Health's Oregon hospitals. Price Decl. Ex. 4, at 27.

## II. Personal Jurisdiction

Skeletal contends that this Court lacks personal jurisdiction. Acumed concedes that Skeletal is not subject general personal jurisdiction in this district, but contends that Skeletal is subject to specific personal jurisdiction.

The first prong of the specific jurisdiction test refers to both purposeful availment and purposeful direction, but in cases involving tortious conduct, court most often apply a purposeful direction analysis. *College Source, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (Fed. Cir. 2011). Acumed contends that Skeletal has purposefully directed its activities related to this lawsuit at residents of Oregon by (1) entering into an exclusive sales agreement with Rocky Mountain, which included an obligation to promote the sale of Reduct products in Oregon; (2) providing price sheets to Rocky Mountain for use with Oregon sales and approving Rocky Mountain's requests for product literature and samples of the Reduct screw; (3) transporting a sample of the Reduct screw to Oregon and using it in a "sales pitch" to an Oregon surgeon; (4) entering into purchase agreements with Trinity Health hospitals, which included the Reduct screw; and (5) selling 1 percent of its products to residents of Oregon.

Skeletal asserts that this case turns on the second prong of the test for specific jurisdiction: whether Acumed's claim "arises out of or directly relates to" the activities Acumed alleges are purposefully directed at Oregon. In making that determination, "the test is whether the activity in the forum state is *a* basis for the cause of action." *HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1308 n. 4 (Fed. Cir. 1999) (emphasis in orginal). To establish that a lawsuit "arises out of or relates to" a defendant's contacts with the forum state, "the plaintiffs must make a *prima facie* showing that their claim for patent infringement is connected" to the defendant's activities within the forum state. *Moldflow Corp. v. Simcon, Inc.*, 296 F. Supp. 2d 34, 41 (D.

Ma. 2003); *Authentify Patent Co., LLC v. Strikeforce Tech., Inc.*, 39 F. Supp. 3d 1135, 1145 (W. D. Wa. 2014) ("Plaintiff must demonstrate by a preponderance of the evidence that its claim for patent infringement is connected to Strikeforce's activity within the State of Washington related to its '858 patent."); *Hockerson-Halberstadt, Inc. v. Costco Wholesale Corp.*, 93 F. Supp. 2d 738, 743 (E.D. La. 2000) ("HHI has not shown that Costco's alleged footwear patent infringement arises out of or directly relates to any Costco activities directed at the state of Louisiana.").

Patent infringement occurs when someone "without authority makes, uses, offers to sell, or sells any patented invention . . . during the term of the patent[.]" 35 U.S.C. § 271(a). Acumed argues that Skeletal has offered to sell the Reduct screw in Oregon. The Federal Circuit has interpreted "offer to sell" liability under § 271(a) "according to its ordinary meaning in contract law, as revealed by traditional sources of authority." *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1254-55 (Fed. Cir. 2000). A party has made an "offer to sell" if it communicates "a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Id.* at 1257 (quoting *Restatement 2d. of Contracts* § 24 (1975)); *see also MEMC Elec. Silicon Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) (finding email exchanges containing a description of the allegedly infringing product did not constitute an offer to sell because they lacked a price term and could not, therefore, be transformed into a contract by the recipient's acceptance).

### A. Rocky Mountain Medical

Acumed argues that three aspects of Skeletal's relationship with Rocky Mountain create personal jurisdiction over Skeletal in Oregon: the distribution of price sheets for Skeletal

products, the sales agreement between Skeletal and Rocky Mountain, and Rocky Mountain's employment of a sales representative, Michael MacDonald, who resides in Oregon.

### 1. The Price Sheets

Skeletal distributed price sheets for its products, including the Reduct screws to Rocky Mountain. These price sheets included pricing for a number of hospitals in Oregon. Kolitch Decl. Ex. B. Acumed asserts that the price sheets "can easily be interpreted as an 'offer to sell' the accused product to Oregon customers at least through the distributor."

The price sheets were sent to Skeletal's distributors, including Rocky Mountain Medical, but they were not shown to customers. Price Decl. Ex. 4, at 19. Based on the record, it does not appear that the price sheets sent by Skeletal to Rocky Mountain were ever communicated to any third party in Oregon and contained no description of the Reduct product or any other traditional indicia of an offer. I cannot, therefore, conclude that the price sheets constituted an offer to sell within the meaning of § 271(a).

### 2. The Sales Agreement

As previously discussed, Skeletal and Rocky Mountain signed a sales agreement under which Rocky Mountain was obligated to market Skeletal products in Oregon, Washington, and Idaho. Kolitch Decl. Ex. D. At least initially, this agreement included an obligation to market Reduct screws in Oregon, although no Reduct screws were actually sold in Oregon and Skeletal amended the sales agreement to forbid the sale or marketing of Reduct screws in Oregon after it was served with the Complaint in this case. Kolitch Decl. Ex. F, at 45.

As previously discussed, Skeletal's practice was to negotiate sales of Skeletal products directly with the facility where they would be used and there is no indication that Rocky Mountain ever engaged in any such negotiations in Oregon on behalf of Skeletal. To the

contrary, the record indicates that Rocky Mountain could not sell Reduct screws without permission from Skeletal. Campbell Decl. at 3.

Furthermore, the contract does not contain the sort of specific terms that constitute an offer to sell under *Rotec* and *MEMC*. The fact that the contract between Rocky Mountain and Skeletal contemplated the eventual sale of the Reduct screw to third parties in Oregon does not rise to the level of an offer to sell within the meaning of § 271(a).

### 3. Michael MacDonald

Rocky Mountain employs Michael MacDonald, an Oregon resident, as a sales representative for Oregon and Washington. Price Decl. Ex. 4 at 12. Campbell approved a request for product literature on the Reduct screw to be sent to MacDonald, but no product literature was ever sent because none was available. Price Decl. Ex. 4, at 13-14.

The simple fact that Rocky Mountain employs an Oregon-based sales representative who markets Skeletal products in Oregon is not sufficient to create personal jurisdiction, as only Skeletal's Reduct screws are at issue in this case. There is no indication that MacDonald ever approached any Oregon customers about the Reduct screws or that he entered into any negotiations sufficient to constitute an "offer to sell" within the meaning of § 271(a).

### B. The Trinity Medical Contract

Acumed asserts that the contract between Skeletal and Trinity Health, which permits Skeletal to sell its products to Trinity Health hospitals, constitutes an "offer to sell" the Reduct screw in Oregon.

Acumed overstates the scope of the agreement between Trinity Health and Skeletal. The agreement permitted Skeletal to sell its products to Trinity Health hospitals, but each individual hospital still makes its own purchasing agreements through the VA process. Second Escagedo

Decl. at 3; Price Decl. Ex. 4, at 26. Skeletal never actually approached any of Trinity Health's Oregon hospitals about purchasing the Reduct screw. Price Decl. Ex. 4, at 27. I must conclude that there was never an "offer to sell" the Reduct screw in Oregon based on the Trinity Health contract.

### C. The Preselling Meeting

In April 2015, Campbell met with an Oregon surgeon to discuss the Reduct screw. Campbell brought a single Reduct screw with him and showed it to the surgeon, telling him that it was a new product that would soon be available. Price Decl. Ex. 4, at 31; 35. Campbell did not provide the surgeon with any literature about the Reduct screw and they did not discuss pricing or other terms. Price Decl. Ex. 4, at 35-36. Acumed argues that this meeting, which Campbell characterized as "preselling," constituted an offer to sell the accused product.

In support of its argument, Acumed relies on *3D Sys., Inc. v. Aarotech Lab., Inc.*, in which the Federal Circuit held that the purpose of the § 271(a) provision against "offers to sell" was to prevent "generating interest in a potential infringing product to the commercial detriment of the rightful patentee." *3D Sys., Inc. v. Aarotech Lab., Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998). The Federal Circuit later clarified, however, that "offers to sell" under § 271(a) were to be assessed under the traditional theory of contract law and that, in order to qualify, the offer to sell would need to contain sufficient terms that the recipient's acceptance of the offer would create a contract. *Rotec*, 215 F.3d at 1257. The price is an essential term in an "offer to sell" under § 271(a). *MEMC*, 420 F.3d at 1378.

Other district courts have found that advertisements and solicitations do not rise to the level of offers. *See Moldflow Corp.* 296 F. Supp. 2d at 43-44. In *Moldflow Corp.*, the defendant's marketing representative distributed "flyers" which contained "a description of the

of the allegedly infringing software as well as some pricing information," but "lacked other terms necessary to create the power of acceptance on the part of the recipients." *Id.* at 44. In particular, the court noted the lack of information about quantity, time of delivery, or terms of payment and found that, without those terms, "none of the companies that received the promotional materials could contractually bind [the defendant] without at least some additional negotiation," and found that the distribution of the flyers did not constitute an offer to sell under § 271(a). *Id.*

In this case, Skeletal's "preselling" meeting with the Oregon surgeon fell below even the conduct described in *Moldflow Corp*. It is undisputed that Campbell did not discuss the price of the Reduct screw when he met with the surgeon, nor did he discuss availability or any other terms of sale. Skeletal never approached the facility where the surgeon worked about purchasing the Reduct screw and never initiated the VA process necessary to sell the Reduct screws to that facility. The meeting cannot, therefore, be considered an offer to sell the Reduct screw.

### D. Skeletal's Oregon Sales

Finally, the fact that Oregon accounts for 1 percent of Skeletal's sales is not sufficient to create specific personal jurisdiction. Acumed does not dispute that Skeletal never sold any Reduct screws in Oregon. Skeletal's Oregon sales are derived from other, unrelated Skeletal products. Acumed's claims in this case do not, therefore, arise from or relate to those activities.

As I have concluded that Plaintiff's claims do not arise from or relate to Skeletal's activities within the State of Oregon, it is not necessary to determine whether the exercise of personal jurisdiction would be reasonable and fair. I conclude that this Court lacks personal jurisdiction over Skeletal.

### III.  Motion to Transfer

Skeletal moves to transfer this case to the Southern District of Florida as the more convenient venue. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). In determining whether transfer is proper, the Federal Circuit applies regional circuit law. *In re Link A Media Devices Corp.*, 662 F.3d 1221, 1222-23 (Fed. Cir. 2011). However, once a district court determines that it lacks personal jurisdiction and dismisses a complaint, it may not transfer the case to another district. *HollyAnne Corp.*, 199 F.3d at 1307.

As I have determined that this Court lacks personal jurisdiction over Skeletal and that dismissal is appropriate, I decline to transfer this case to the Southern District of Florida.

### Conclusion

This Court lacks personal jurisdiction over Defendant Skeletal Dynamics, LLC. Accordingly, Defendant's Motion to Dismiss, ECF No. 10, is GRANTED. This case is DISMISSED without prejudice.

It is SO ORDERED and DATED this \_\_\_13\_\_\_ day of July 2016.

*/s/ Owen M. Panner*
OWEN M. PANNER
Senior District Judge